[Civ. No. 1733.   First Appellate District.—February 28, 1916.]

PEARL M. McINTOSH et al., Respondents, v. CLARENCE M. HUNT, Appellant.

TRUST—CONVEYANCE OF REAL PROPERTY BY WIFE TO HUSBAND—NATURE OF CONTEMPORANEOUS ORAL UNDERSTANDING—LIFE ESTATE—SUFFICIENCY OF EVIDENCE.—In this action to have a trust declared in certain real estate conveyed to the defendant by his wife a short time before her death, it is held that notwithstanding the sharp and irreconcilable conflict in the statements of the respective parties as to the nature of the contemporaneous oral agreement, there is sufficient evidence to support the findings to the effect that the title of the defendant was to be in the nature of a life estate, with right to the income of the property, with the fee in remainder to the plaintiffs at his death.

ID.—EVIDENCE—LETTER—INSUFFICIENT RECORD ON APPEAL.—In such an action alleged error in refusing the admission in evidence of a letter written by the defendant to the husband of one of the plaintiffs in reply to a letter written by the latter explaining the nature and effect of the escrow arrangement in question, cannot be considered, where the record contains no copy of the excluded letter.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. George A. Sturtevant, Judge.

The facts are stated in the opinion of the court.

Wm. M. Cannon, for Appellant.

Powell & Dow, P. E. Keeler, and C. H. McIntosh, for Respondents.

RICHARDS, J.—This is an appeal from a judgment in plaintiffs' favor in an action brought by them against the defendant, their father, to have a trust declared in respect to certain real estate conveyed by their mother to him a short time before her death.

The principal contention of the appellant is that the evidence is insufficient to sustain the findings and judgment of the trial court. The record is voluminous, but there are certain facts of vital importance to the determination of this issue concerning which there is no dispute, and which may be briefly set forth as follows: The defendant Clarence M. Hunt and his wife were married about thirty-seven years before the latter's death. Their life together had been happy, congenial, and mutually confidential during the whole of this period, and no differences or quarrels of any kind had ever arisen between them. Two children had been born of this marriage—the plaintiffs herein; and these had grown up in the home of their parents, and had in due time married and established themselves in homes of their own, the plaintiff Pearl M. having wedded C. H. McIntosh, a lawyer residing and practicing his profession in the state of Nevada, and the plaintiff Reuben H. having elected the profession of physician, with his residence and practice in San Francisco. During the earlier years of his married life the defendant Clarence M. Hunt had been engaged in various occupations, working generally upon a salary, and had been enabled thereby not only to support his family comfortably, but to give to each of his two children the benefit of an excellent education, including for his daughter a course in the University of California, and for his son a degree from a local medical college. He had also laid aside some property of his

own.  A few years before the death of his wife, Hattie G.
Hunt, which occurred in 1910, she received the sum of thirty-
one thousand dollars as an inheritance from her parents'
estate, which money was turned over to her husband for in-
vestment, and which was invested by him in several pieces of
real estate in San Francisco and in Alameda County, the
deeds to which being in each instance taken in the name of
his wife.  About this time the defendant gave up his other
occupations, and thereafter devoted himself to the manage-
ment of these investments and of his own properties.  He
attended to all of the details of purchasing his wife's prop-
erty, arranging for the mortgages and insurance which were
to be placed and carried thereon, caring for and renting the
property, collecting the rents, and paying the interest and
other charges.  The income from the property of his wife
and of himself was commingled in a common fund, from
which the expenses of the family were taken, and from which
also each received such money as either required, no account
being ever had between them.  In the summer of 1909 a
small lump was found to be growing upon the breast of the
wife which occasioned some family alarm, but which did not
seem to affect her general health, nor operate to interfere
with her intention of taking a trip north to visit the Seattle
Exposition.  On the eighth day of July, 1909, just before she
started upon said trip, she made, executed, and delivered to
the defendant, her husband, three deeds, absolute in form,
with an expressed consideration in each of $10, to the several
pieces of real estate theretofore standing in her name and
involved in this litigation.  These deeds were acknowledged
and delivered before and in the presence of Addie L. Ballou,
a notary public of the city and county of San Francisco, who
was a witness in the case and who testified that no conversa-
tion relating to the creation of a trust or other limitation
upon these conveyances occurred in her presence between the
parties at the time of the delivery of the deeds.  These deeds
were retained by the defendant until some time in the month
of November, 1910, when they were presented for record in
the respective counties where the property was located.  A
few days after their recordation the insurance policies upon
these properties were transferred from the name of Hattie
G. Hunt to that of Clarence M. Hunt, his wife signing the
necessary papers for such transfer in the form of which it

was recited, "ownership of the property herein insured having actually passed to Clarence M. Hunt, for value received I hereby transfer and assign to him all my title and interest in this policy." In the meantime the lump which had been observed on the breast of Mrs. Hunt continued to grow until it was at length diagnosed as cancer, and two operations were undertaken for its removal. These proved unavailing, and after the second operation in August, 1910, she had failed rapidly until it became apparent that she was soon to die. In the month of December, 1910, the members of her family were collected at her home in anticipation of her near dissolution. On the twenty-second day of December they were all gathered in her room, the defendant and the trained nurse also being present, at which time the dying woman was engaged in distributing among them such trinkets and personal effects as she wished each to have.

Up to this point there is no disagreement as to the facts of the case; but from this moment forward the testimony of the plaintiffs and the defendant is in sharp and irreconcilable conflict. According to the testimony of the plaintiffs, of C. H. McIntosh, of Mrs. R. H. Hunt, and of Luella Walden, the trained nurse, the following statement of the conversation and conduct of the respective parties present may be fairly collated: After the gifts of her personal effects and property as above stated, Mrs. Hunt, speaking to her son-in-law and to the defendant, and referring to the real estate in question, said, "I have deeded this property to Clarence, but with the understanding that he is to have a life income and that the property was to go to the children. I have always trusted 'Gorrie' [her pet name for her husband], but people change, and he may change or may get married again. That property belongs to me; it is my own property, came to me from my father. It was understood that it was to go to the children, and that Gorrie was to have the use and income of it during his lifetime to provide himself with what he needed and make himself comfortable; but people, as I say, change; he may get married again. I do not want any mistakes as to the understanding that was had between us with reference to the ownership of this property. I do not want some outside person, same stranger whom he might marry, to be in a position to claim or obtain any part of my property that it was intended and agreed belonged to my children. I want this

in writing [speaking to her husband]—not that I don't trust you, but you might change." Mr. Hunt replied, "Yes, Mamma"; and then he and McIntosh retired from the room into the hallway, where, according to the latter, the following conversation occurred: "I said to him, 'Well, Gorrie, how is this thing to be arranged?' 'Well,' he said, 'I don't know just how it had best be fixed up.' 'Well,' I said, 'Gorrie, I can tell Mother—she is waiting for some disposition of it— I can tell her that you have executed a declaration of trust, and then the matter can be fixed up in that way later.' He said 'All right; tell her that, and we will fix it up later.'" They then returned to the bedroom, when, according to Mr. McIntosh, Mrs. Hunt said, "Well, what is to be done? I want you to fix it, Bertie, now, and in writing, so there can't be any misunderstanding or mistake." "'Well,' I said, 'Mother, Gorrie has executed a declaration of trust in favor of the children covering this property.' She turned her head on the pillow toward Mr. Hunt and said, 'Clarence, is that true?' and he said, 'Yes, Mamma, that is correct. Everything will be all right.'"

This ended the matter for the time being. Mrs. Hunt died a few days later. During the month of January, 1911, as Mr. McIntosh relates, the subject was revived in conversation between himself and Mr. Hunt, in which the former said, "It can either be done by a declaration of trust or by a trust deed, or by deed delivered in escrow with an agreement for the delivery of the instrument to the grantees upon your death," to which Mr. Hunt replied, "I believe I would prefer the escrow deeds"; and it was then agreed that Mr. Hunt was to get the data for the deeds and send it to Mr. McIntosh at Tonopah, who was to draw the papers and send them to Mr. Hunt for execution.

To practically all of the foregoing evidence with respect to what occurred at the bedside of his wife, with his son-in-law, and again later in the month of January, Mr. Hunt made a positive and categorical denial when upon the witness-stand; but his testimony in that regard stands practically alone as against the statements of all the other members of the family who were present and of the trained nurse.

The record further shows that on January 18, 1911, Mr. Hunt wrote an affectionate letter to his son-in-law, then in Nevada, inclosing documents from which the latter could get

descriptions of the property, and directing him to make out escrow deeds in favor of his son and daughter, which he stated he would sign and acknowledge and would have placed in escrow. In response to this letter he presently received from Mr. McIntosh drafts of several deeds, each covering a separate piece of the property in question, in which he was named as the grantor and his son and daughter as the grantees. He acknowledged receipt of these deeds by letter dated January 23, 1911, in which he asked several questions as to the manner and form of their execution, but made no objection to their granting clauses. In connection with these deeds, and either at the time of their transmission or a few days later, Mr. McIntosh had also forwarded to Mr. Hunt the draft of an escrow agreement, setting forth specifically, among other things, that, "Whereas the undersigned Clarence M. Hunt accepted, took and holds title to said lands and premises above described for the benefit of said Reuben H. Hunt and said Pearl M. McIntosh jointly pursuant to and in virtue of an agreement between said Clarence M. Hunt and the late Hattie G. Hunt, his wife, the consideration of which agreement was that the undersigned Clarence M. Hunt should during his lifetime have and receive for his own sole uses, benefits and disposal all and singular the net rents and income of and from all of said lands and premises—Now therefore it is provided that the undersigned Clarence M. Hunt shall have and receive . . . the free and unrestricted use and enjoyment of all of said premises and property as to the rents and income thereof and therefrom for his own uses, purposes and benefits during his life-time," and in which also an unnamed escrow trustee is directed to deliver the aforesaid deeds to the plaintiffs as the grantees thereof upon the death of Clarence M. Hunt. On February 1, 1911, Mr. McIntosh replied to the letter of the defendant of January 23d, explaining at considerable length the nature and effect of the execution and delivery of deeds in escrow. To this letter the defendant wrote a reply, which was not received in evidence and which will be dealt with later. The whole matter seems to have rested at this point for a period of several months, although the defendant testifies that from the time of the receipt of the letter of Mr. McIntosh of February 1, 1911, explaining the nature and effect of an escrow deed, he had

resolved not to sign the deeds. During the summer of 1911 Mr. Hunt's intention to marry again came to the attention of his children and resulted in an increasing discord, during which the discussion of his intent to carry into effect the alleged understanding with his wife and children in regard to the property was renewed, and during which he definitely refused to make any disposition of the property which would hamper in any way his control over it. After several vain efforts to adjust the matter the present action was brought.

From the foregoing *résumé* of the evidence in the case we are of the opinion that, notwithstanding the sharp and irreconcilable conflict in the statements of the respective parties, and notwithstanding that the defendant—the only living witness to the agreement, if any, between himself and his wife contemporaneously with the execution and delivery of the deeds from herself to him—swore positively that there was no understanding or agreement between them at the time these deeds were made, or at any other time, that they were to be other than absolute conveyances of the property, to him, we think there is sufficient evidence presented by the plaintiffs, if accepted by the court, to support its findings and judgment to the effect that such a contemporaneous understanding existed between the defendant and his wife that his title to the property was to be in the nature of a life estate with the right to its income, with the fee in remainder to his children at his death.

The appellant urges that the finding of the court that it was the *net* income only which the defendant was to enjoy is unsupported by any evidence; but we think that the finding is fairly deducible from the record, and particularly from the terms of the escrow agreement prepared at the defendant's direction, and also from the proofs of the way in which the income of the property had been disposed of both before and after the defendant received the title to it from his wife.

The appellant further insists that the court committed an error of law in its refusal to permit the defendant to put in evidence the letter which the defendant had written and sent to Mr. McIntosh about February 1, 1911, upon the receipt by him of the letter from Mr. McIntosh explaining the nature and effect of the escrow arrangement. In making this con-

tention the appellant relies mainly upon the language of section 1854 of the Code of Civil Procedure, which reads as follows: "When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing, which is necessary to make it understood, may also be given in evidence." The appellant urges that under this section of the Code of Civil Procedure he was entitled to have this letter of his own admitted in evidence, both because it was a part of a series of conversations and negotiations between the parties, and because it was an answer to a letter of Mr. McIntosh, who was apparently acting on behalf of the plaintiffs in seeking to consummate the escrow arrangement.

The difficulty with the question thus presented lies not so much with the law regarding it, as it does in the fact that the record before us contains no copy of the letter which the appellant claims was thus wrongly excluded; and we are therefore unable to determine whether the letter in question was in any true sense such an answer to the letter of Mr. McIntosh as would entitle it to admission, or whether it had any reference or relevancy whatever either to the subject matter of the McIntosh letter, or to the pending negotiations between the parties; and we are, therefore, unable to say that the trial court, which had the contents of the letter before it, was in error in refusing it admission in evidence.

The appellant further contends that the court was in error in refusing to permit the defendant to testify as to the conversations occurring between himself and his wife at the time of the execution of the deeds to him. No authority is cited to support the appellant's contention in this regard; and we think the inhibition contained in section 1881 of the Code of Civil Procedure respecting communications between husband and wife covers exactly the case in hand, and furnishes a full justification for the ruling of the court in the exclusion of this evidence.

No other grounds of alleged error being urged by the appellant, the judgment is affirmed.

Lennon, P. J., and Kerrigan, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 29, 1916, and the following opinion then rendered thereon:

THE COURT.—The petition for a rehearing is denied. The only matter contained in the court's decision which might require correction is the statement therein that the defendant at the time of the bedside conversation answered, "Yes, Mamma," to his wife's statement of the agreement between them at the time of the execution of the deeds in question. The record does not show that this reply of the defendant was given at that time, but in our opinion a reading of the entire record shows the assent of the defendant to the correctness of his wife's assertion, as to the oral understanding attending the execution of the deeds. There is sufficient evidence upon this point to justify the trial court, hearing and seeing the witnesses before it, in the conclusion that the proof was clear and convincing as to the existence of the contemporaneous oral understanding upon which the plaintiffs rely.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 27, 1916, and the following opinion then rendered thereon:

THE COURT.—The application for a hearing in this court after decision by the district court of appeal of the first district is denied.

In denying the application we deem it proper to say that we are not prepared to give our assent to that portion of the opinion which substantially holds that the trial court did not err in refusing to allow the defendant to answer certain questions addressed to him as to what was said to him by his wife at and prior to the execution of the deeds to him. An examination of the record discloses that the object of defendant in this regard was substantially accomplished by his being permitted, over plaintiff's objections, to give testimony as to the same subject matter. In view of the testimony thus given the error, if any, cannot be held to have been prejudicial.